**RE/MAX INTERNATIONAL, INC., et al., Plaintiffs,**

**v.**

**REALTY ONE, INC., et al., Defendants.**

**No. 1:94–CV–0062.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 19, 1996.

---

**1482**

Stephen J. Squeri, Charles M. Kennedy, IV, Leozino Agozzino, Elizabeth A. Grove, Jones, Day, Reavis & Pogue, Cleveland, OH, for Re/Max International, Inc., A.E.B.T.S., Inc., T.M.A.T.N.B., Inc., D.F.I., Inc., Joseph P. Grady, Inc., McGrew Realty, Inc., Property Professionals, Inc.

George W. Cochran, Streetsboro, OH, Edward W. Cochran, Shaker Heights, OH, for Re/Max Northeast Ohio Limited Partnership, Zames Realty, Inc., Realty Properties, Inc., True Independence Partnership.

Richard M. Markus, Porter, Wright, Morris & Arthur, Cleveland, OH, David R. Cohen, Porter, Wright & Morris, Cleveland, OH, for Realty One, Inc.

Thomas Ignatius Michals, John J. Eklund, Philip J. Carino, Nicholas A. Rossi, Maura L. Hughes, Calfee, Halter & Griswold, Cleveland, OH, for Smythe Cramer Co.

### MEMORANDUM OPINION

(Resolving Docket Nos. 300, 301, 304, 306, 307, 308, 310 and 312)

DOWD, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ............................................. 1483
II. BACKGROUND FACTS ...................................... 1484
III. SUMMARY JUDGMENT STANDARD ..................... 1486
IV. THE MONOPOLIZATION CLAIMS ....................... 1487
  A. The Claims and Parties ................................ 1487
  B. The Underlying Law ................................... 1488
    1. Monopolization .................................... 1489
    2. Attempted Monopolization ....................... 1489
    3. Conspiracy to Monopolize ........................ 1490
  C. Analysis ............................................... 1490
    1. Plaintiffs' Expert Testimony ..................... 1490
    2. The Status of Re/Max Int'l and Re/Max NE Ohio .... 1492
    3. The Monopolization Claims ....................... 1493
      a. Property Professionals v. Smythe Cramer ...... 1493
      b. Five Franchisees v. Realty One ................ 1494
    4. The Attempted Monopolization Claims ........... 1495
    5. The Conspiracy to Monopolize Claims ........... 1495
V. PLAINTIFFS' CONSPIRACY CLAIMS ................... 1496
VI. PLAINTIFFS' STATE LAW CLAIMS ..................... 1501
  A. Deceptive Trade Practices ............................ 1501
    1. Misrepresentation of Market Characteristics .... 1501
    2. Disparagement ................................... 1502
  B. Unfair Competition ................................... 1503
  C. Tortious Interference With Potential Business Relations ... 1503
VII. REALTY ONE'S COUNTERCLAIMS ..................... 1504
  A. § 1 Conspiracy to Restrain Trade .................... 1504
    1. The "Cooperative Commission Conspiracy" Claim ... 1504
    2. The "Sham Litigation" Claim ..................... 1506
  B. Intentional Interference With Business Relationships ... 1507
  C. Unfair Competition ................................... 1508
VIII. CONCLUSION ............................................ 1508
IX. RULE 54(b) CERTIFICATION ............................ 1509

## I. INTRODUCTION

In this complex real estate antitrust case, twelve plaintiffs allege that two real estate companies have conspired to restrain trade and monopolize segments of the commercial real estate industry in parts of Northeast Ohio. Defendants in turn have filed a series of counterclaims, and the time has come to resolve a bevy of summary judgment motions.

A brief history of the pleadings is helpful in framing the case. Plaintiffs Re/Max International, Inc. ("Re/Max Int'l") and associated franchisees, A.E.B.T.S., Inc. ("Re/Max Crossroads") and T.M.A.T.N.B., Inc. ("Re/Max Affinity") filed a ten-count complaint against Defendants Realty One, Inc. ("Realty One") and Smythe Cramer Co. ("Smythe Cramer") asserting federal subject matter jurisdiction pursuant to 28 U.S.C. § 1337. Plaintiffs amended their complaint to join four additional Re/Max Int'l franchisees as plaintiffs—D.F.I., Inc. ("Re/Max Results"), Joseph P. Grady, Inc. ("Re/Max Xpress Realty"), McGrew Realty, Inc. ("Re/Max Key Realty"), and Property Professionals, Inc. ("Re/Max Property Professionals"), but the substance of the complaint's allegations remained the same (Docket No. 14).[1] In addition to this initial group of seven, five more entities have since intervened as plaintiffs: Re/Max Northeast Limited Partnership ("Re/Max NE Ohio"), Zames Realty, Inc. ("Zames Realty"), Realty Properties, Inc. ("Realty Properties"), True Independence Partnership ("True Partnership"), and R.E.P., Inc. ("REP"). This second group of five has set forth its claims in the Intervening Plaintiffs' Second and Third Amended Complaints (Docket Nos. 99 and 147), which are substantially the same as the original plaintiffs' First and Second Amended Complaints.

Plaintiffs[2] seek private enforcement of the antitrust laws pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, due to defendants' alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs also pursue pendent state law claims for violations of the Valentine Act, O.R.C. § 1331.01 *et seq.*, and the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*; and for unfair competition and tortious interference with potential business relations. Plaintiffs assert supplemental jurisdiction under 28 U.S.C. § 1367.

Plaintiffs' Count I alleges that the defendants conspired to restrain trade in violation of § 1 of the Sherman Act. Count II alleges that defendants conspired to monopolize in violation of § 2 of the Sherman Act. Counts III and IV, alleging § 2 violations of monopolization and attempted monopolization, respectively, are asserted against Realty One only. Counts V and VI, also alleging § 2 violations of monopolization and attempted monopolization, respectively, are asserted against Smythe Cramer only.

The remaining counts are asserted against both defendants. Count VII alleges unlawful formation of trusts under Ohio's Valentine Act. Count VIII alleges deceptive trade practices under Ohio's Deceptive Trade Practices Act. Count IX and X, asserted under Ohio law, allege unfair competition and tortious interference with potential business relations, respectively.[3]

Realty One counterclaims against plaintiffs, alleging violation of § 1 of the Sherman Act and tortious interference with business relations and unfair competition under Ohio law. Smythe Cramer counterclaims for a

---

1. Plaintiffs later received permission to file a Second Amended Complaint making a single technical change to reflect the post-suit alteration in corporate status of two of the original plaintiffs. At the end of 1994 Re/Max Affinity transferred its assets by assignment to Re/Max Crossroads. The rest of the complaint remained the same. (Docket No. 275).

2. Unless otherwise specified, the use of the term "plaintiffs" will refer to the collective group of original and intervening plaintiffs. The intervening plaintiffs did not distinguish their claims from the claims of the original plaintiffs and during the summary judgment process filed memoranda merely incorporating the arguments of the original plaintiffs.

3. Not every plaintiff asserts every claim. The distinct claims of particular plaintiffs will be discussed in the analytical portions of this opinion.

declaratory judgment on the validity of various actions taken by it in this dispute.[4]

At issue are the following: Realty One's motions for partial summary judgment on federal and state antitrust conspiracy claims (Docket No. 308), on the monopoly claims (Docket No. 310), and on all other state law claims (Docket No. 312); Smythe Cramer's motions for partial summary judgment on the same three sets of claims (Docket Nos. 306, 307 and 304, respectively); and original plaintiffs' and intervening plaintiffs' motions for summary judgment on Realty One's counterclaims (Docket Nos. 301 and 300, respectively). The matters have been fully briefed, and the Court has had the benefit of oral arguments.

For reasons set forth below, Realty One's and Smythe Cramer's motions are granted in full. Plaintiffs' and intervening plaintiffs' motions with respect to the counterclaims are granted in part and denied in part.

## II. BACKGROUND FACTS

Re/Max Int'l, its associated franchisees and other intervening plaintiffs claim that Realty One and Smythe Cramer have engaged in anticompetitive conduct to prevent the expansion of the "Re/Max 100% Concept" and the creation of additional Re/Max affiliates in Northeast Ohio. Re/Max Int'l is a franchisor of a real estate broker business system. Re/Max franchises have established themselves nationwide, including in Northeast Ohio. Realty One and Smythe Cramer are long-established real estate brokerage firms with a significant presence in Northeast Ohio. Realty One and Smythe Cramer do not franchise their way of doing business.

Plaintiffs contend that ever since they entered the Northeast Ohio market, Realty One and Smythe Cramer, collectively and individually, have intentionally refused to deal with them through implementation of anticompetitive practices. Specifically, plaintiffs claim they have been the victims of a practice known in the real estate business as "adverse commission splits" ("ACS").

Commission splitting among real estate brokers and agents is not uncommon and might be summarized as follows: Prospective home buyers contact a real estate broker to express an interest in buying a home. The broker or his or her sales agent tells the home buyers that there will be no extra charge for his or her services in finding a suitable home under certain circumstances. At that point the broker presents the prospective buyers with two options. First, as agent or subagent of the home *seller,* the broker can show homes which are listed on a computerized, comprehensive multiple listing service ("MLS").[5] If the prospective buyers purchase a home listed on the MLS, the broker, as agent or subagent for the sellers, will receive a percentage of the buyers' purchase price as a commission. If completing the sale requires a cooperative transaction between two different real estate agencies, i.e., if the broker producing the buyer is affiliated with one agency and the home is listed with another agency, the broker will receive a partial share of the commission, i.e. a "commission split," which is divided between the listing agency and the buyer-producing broker as the listing agency's subagent.

Alternatively, the broker may offer to act as the agent for the *buyer.* As a buyer's agent, the broker may still use the MLS system to locate suitable homes, but the broker has no agency relationship with the seller. However, the buyer's broker still expects to receive full compensation for his or her services from a commission based upon purchase price. To achieve this arrangement, the buyer's broker reaches an agreement with the broker of the seller (the listing agency) to receive a portion of the commission which the seller's broker receives from

4. Smythe Cramer did not pursue its action for a declaratory judgment, and the Court sees no need to issue such a judgment in light of its disposition of the claims.

5. There are two multiple listing services in Northeast Ohio: the Northern Ohio Region Multiple Listing Service ("NORMLS") and the Akron Area Multiple Listing Service ("AAMLS"). The bylaws of NORMLS are drafted and enforced by the board of directors for the Cleveland Area Board of Realtors (CABOR), while AAMLS' bylaws are drafted and enforced by the board of directors of the Akron Area Board of Realtors (AABOR).

the purchase price. In such a case, the seller's broker, rather than keeping the entire commission, "splits" the commission with the buyer's broker.

Re/Max franchisees emphasize the buyer's agent aspect of the real estate business, although they act as seller's agents as well. Realty One brokers use both systems regularly. Smythe Cramer brokers do not act as buyer's agents.

The exact split under either alternative normally is posted on the MLS system on a property-by-property basis and is often 50-50. However, the bylaws of both NORMLS and AAMLS permit the listing agency to provide a lesser split to a specific competitor. Such lesser splits are conveyed by advance letter to the particular competitor stating that notwithstanding the percentage split listed on the MLS, that company's agents will receive a specific reduced percentage split.

In addition to the splits previously discussed, agents for most real estate companies divide their actual commission with the company with which they are associated, usually on a 50-50 basis. The company takes its half of the commission for the costs of recruitment, training, advertising, overhead, and associated expenses.

However, the Re/Max system uses a different method of revenue sharing, allowing agents to keep 95 to 100 percent of their commissions while imposing flat monthly fees and costs upon the agents. Re/Max Int'l touts this system as the "100% Concept" and claims that the compensation structure awards high productivity and gives its franchisees and their agents a competitive advantage over traditional competitors.

Unlike traditional real estate companies, Re/Max Int'l does not operate through branch offices. Most Re/Max offices are independently owned and operated franchises consisting of at least one broker/owner and licensed sales agents who are affiliated with the broker/owner as independent contractors. The owner/broker receives its compensation from each independent contractor via a flat monthly charge for the right to do business as a Re/Max associate.

Plaintiffs contend that they are treated in an illegally anticompetitive manner in residential real estate transactions. Their complaint primarily rests on the fact that Realty One and Smythe Cramer insist on a more unfavorable commission split with Re/Max brokers than they do with most non-Re/Max brokers. Specifically, plaintiffs allege defendants a) impose the ACS upon every Re/Max franchisee acting as a seller's agent for the listings of either defendant; b) impose the ACS on every Re/Max franchisee acting as buyer's agent for listings of either defendant, while at the same time agreeing not to impose the ACS upon each other's agents when acting as buyer's agents; c) induce listing customers not to do business with Re/Max; d) through their domination of CABOR, eliminate any fair dispute resolution procedure; e) publicly disparage Re/Max with knowing false representations of fact; and f) lie to their own agents in an effort to hinder Plaintiffs' recruitment of such agents. (Second Amended Complaint at ¶ 31; Intervening Plaintiffs' Third Amended Complaint at ¶ 32).

The record indicates that on April 3, 1987, Realty One, pursuant to the rules of CABOR, notified Re/Max brokers that when an agent associated with Re/Max produced a buyer for a residential real estate listing held by Realty One, Realty One would grant the Re/Max agent a commission split of 30% of the total commission rather than the 50% provided in most MLS cooperative transactions. Roughly six weeks later, on May 13, 1987, Smythe Cramer notified Re/Max brokers that their agents would receive a commission split of only 25% for producing buyers on listings held by Smythe Cramer.

Because Realty One and Smythe Cramer together hold a large percentage of the listings on NORMLS and AAMLS, these adverse commission splits ["ACS"] affect a significant number of transactions involving Re/Max as representatives of the buyers. As a result, plaintiffs allege, fewer agents made the decision to become Re/Max agents, thereby hindering plaintiffs' growth.

Plaintiffs allege that the nearly contemporaneous behavior of the two defendants is evidence that they had a prior agreement to impose the ACS, in violation of Section 1 of

the Sherman Act which prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The alleged agreement between Realty One and Smythe Cramer to impose and maintain the ACS forms the heart of plaintiffs' § 1 complaint.

Realty One and Smythe Cramer deny conspiring to impose the ACS. Each states that it made an independent business decision to combat a competitor vowing to lure away their most successful agents. They assert that Re/Max franchisees were recruiting their top agents with the promise that if they join Re/Max they will receive 100% of each commission rather than the 50% they were receiving. They decided to cut the amount of commission paid to a Re/Max agent, with the end result that the agent would obtain roughly the same commission whether he or she received 100% of the commission as ·a Re/Max agent or 50% of the commission as a Realty One or Smythe Cramer agent.

Plaintiffs respond that imposing the ACS would not have made business sense unless each company knew the other would do the same. They allege that if only one defendant imposed the ACS, Re/Max agents would have concentrated their efforts on selling the other broker's listings, resulting in the imposing defendant losing market share.

Plaintiffs also assert a series of claims lying in § 2 of the Sherman Act, which prohibits monopolizations, attempts to monopolize and conspiracies to monopolize. They allege that the defendants conspired to monopolize certain geographic markets for real estate brokerage services and for recruitment and retention of real estate agents. They further allege that each defendant individually monopolized and/or attempted to monopolize certain geographic areas in northeast Ohio.

Defendants deny all wrongdoing. Realty One asserts a counterclaim alleging that Re/Max Int'l as franchisor, Re/Max NE Ohio as subfranchisor, and associated franchisees

conspired to restrain trade and destroy competition in the business of listing and selling real estate in Northeast Ohio. Realty One alleges that the conspirators agreed upon the compensation that Re/Max brokers would pay other brokers for cooperative transactions in an effort to raise and stabilize the price of real estate broker services in a *per se* unlawful manner. Realty One further alleges that the conspirators have instituted a continuing strategy of meritless judicial proceedings against Realty One and have incited a series of government investigations without probable cause.

The Court already has discussed at length the underlying issues and law in an opinion which addressed earlier motions to dismiss and for partial summary judgment on certain claims. *Re/Max Int'l v. Realty One, Inc.*, 900 F.Supp. 132 (N.D.Ohio 1995).[6]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to

---

6. In that opinion, the Court granted plaintiffs' motion for judgment on the pleadings as to significant portions of Realty One's antitrust counterclaim. *Re/Max Int'l*, 900 F.Supp. at 171. Realty One indicates in its recent filings its belief that the Court erred in that decision. However, Realty One did not file a motion to reconsider the decision, and the Court believes now is not the time to revisit the issues previously discussed at length.

support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1609 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510–11. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2510).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

## IV. THE MONOPOLIZATION CLAIMS

### A. The Claims and Parties

A starting point in an extended monopolization analysis involving multiple parties and claims is articulating which plaintiffs are asserting which claims.

In Count II of the complaint, all plaintiffs assert a claim against both defendants for conspiracy to monopolize relevant markets in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

Counts III and IV are asserted by franchisor Re/Max Int'l, subfranchisor Re/Max NE Ohio,[7] and franchisees Re/Max Affinity, Zames Realty, Realty Properties, True Partnership and REP against Realty One only. Count III is a claim of monopolization in violation of § 2. Count IV is a claim of attempted monopolization in violation of § 2.

Counts V and VI are asserted by franchisor Re/Max Int'l, subfranchisor Re/Max NE Ohio, and franchisee Re/Max Property Professionals against Smythe Cramer only. Count V is a claim of monopolization in violation of § 2. Count VI is a claim of attempted monopolization in violation of § 2.

### B. The Underlying Law

Section 2 of the Sherman Act, 15 U.S.C. § 2, imposes liability upon "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire to monopolize any part of the trade or commerce among the several states ..."

■ Because a claim of monopoly can only be brought in a specific market, the first step in asserting any § 2 claim is defining the relevant market. See Potters Med. Ctr. v. City Hosp. Ass'n, 800 F.2d 568, 574 (6th Cir.1986). A relevant market has two dimensions: a product market and a geographic market. Smith v. Northern Mich. Hosps., Inc., 703 F.2d 942, 954 (6th Cir.1983). The burden is on the plaintiff both to establish the relevant market and to prove it is realistically in the relevant markets it postulates. See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1423 (6th Cir. 1990), cert. denied, 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991).

■ The product market includes products which are reasonably interchangeable by consumers for the same purpose or have a high cross elasticity of demand. See United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). Cross elasticity focuses on "the extent to which customers will change their consumption of one product in response to a price change in another." Eastman Kodak

Co. v. Image Technical Services, Inc., 504 U.S. 451, 469, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). The geographic market consists of the area of effective competition. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir.1991).

■ A party has monopoly power if it has the ability to control prices or exclude competition in a relevant market. duPont, 351 U.S. at 391, 76 S.Ct. at 1004–05; Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir.1982); Tarrant Service Agency, Inc. v. American Standard, Inc., 12 F.3d 609 (6th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994). Accordingly, the focus of a § 2 claim is on the damage to competition, not to individual competitors. With that in mind, the Sixth Circuit has warned that § 2 "must be used with the greatest caution" so as not to hinder "competitive zeal." Langenderfer, 917 F.2d at 1422, 1423. As Langenderfer stated:

> Competition is a ruthless process. A firm that reduces costs and expands sales injures rivals—sometimes fatally. The firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit. These injuries to rivals are by-products of vigorous competition, and the antitrust laws are not balm for rivals' wounds.

Id. at 1422 (quoting Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 784 F.2d 1325, 1328 (7th Cir.1986)). See also United States v. Aluminum Co. of America, 148 F.2d 416, 430 (2d Cir.1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."). The focus, therefore, is on whether plaintiffs have raised a genuine issue of material fact that defendants' alleged conduct has harmed consumers and competition.

Plaintiffs assert three different causes of action under § 2: 1) monopolization, 2) attempted monopolization, and 3) conspiracy to monopolize. Each has separate elements and merits individual attention.

---

7. Re/Max NE Ohio describes itself in its complaint as an Ohio limited partnership that is the exclusive licensee and owner of the "Re/Max" trademark, trade name, trade secrets and associated Re/Max concept in Northeast Ohio.

### 1. Monopolization

■ The offense of monopolization under § 2 has two elements: 1) the possession of monopoly power in the relevant market, and 2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

A determination of monopoly power is closely tied to the defendant's market share. While a high percentage of market share does not necessarily indicate a firm's capacity to achieve a monopoly, *Richter*, 691 F.2d at 826, a low percentage of market share can be fatal to a claim of monopoly for the simple reason that a party with only a fraction of the market cannot "control prices or exclude competition." *See duPont*, 351 U.S. at 391, 76 S.Ct. at 1005.

There is no hard and fast rule as to what percentage of market share is required to establish a monopoly. However, no party can cite a Sixth Circuit case holding that a defendant with less than 50% of the market has monopoly power. Indeed, two cases from the Northern District of Ohio stated that control of less than 50% of the relevant market is by itself sufficient evidence that monopoly power does *not* exist. *Mowery v. Standard Oil Co. of Ohio*, 463 F.Supp. 762, 771 (N.D.Ohio 1976), *aff'd without opinion*, 590 F.2d 335 (6th Cir.1978); *Lynch Business Machines, Inc. v. A.B. Dick Co.*, 594 F.Supp. 59 (N.D.Ohio 1984). The Sixth Circuit has gone so far as to state that a market share of 75% to 80% "should be regarded as a starting point" in determining whether a party has a monopoly. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 850 (6th Cir.1979). Although the "starting point" in *Byars* is a bit high compared to other cases, the Court finds reasonable and well-supported another Sixth Circuit case which stated, "There is substantial merit in a presumption that market shares below 50 or 60 percent do not

constitute monopoly power." *Langenderfer*, 917 F.2d at 1443 (quoting Areeda & Hovenkamp, *Antitrust Law*, § 518.3 (1988 Supp.)).[8]

■ Market share alone is not sufficient to establish monopoly power. Factors such as competitiveness of the market, number and strength of competitors, market trends and the presence or absence of significant barriers to entering the market also are useful in determining whether a defendant has monopolized a market. *See Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 894 (10th Cir.1991).

Even if monopoly power can be established, a plaintiff still bears the burden of showing that such power is acquired or maintained willfully rather than as a consequence of superior product, business skill or historic accident. *Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04. "This notion has usually been expressed by saying that size does not determine guilt; that there must be some exclusion of competitors; that the growth must be something else than natural or normal; that there must be a wrongful intent, or some other specific intent, or that some unduly coercive means must be used." *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945) (Hand, J.) (quotations omitted). The distinction between legal, shrewd competition and illegal, willful monopolization may be blurred at times. The plaintiff bears the "stiff burden" of showing that the challenged conduct is more than "unfair, impolite or unethical," *Langenderfer*, 917 F.2d at 1422, and actually is intended to create or maintain a monopoly.

### 2. Attempted Monopolization

■ The elements of attempted monopolization are 1) anticompetitive conduct; 2) specific intent to monopolize; and 3) a dangerous probability of success. *Langenderfer*, 917 F.2d at 1431 (citing *Lorain Journal v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951)).

---

8. In the seminal monopoly case *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945), cited at pages 1488–89 *supra*, Judge Learned Hand observed in dictum that "it is doubtful whether sixty or sixty-four percent would be enough [to constitute a monopoly]; and certainly thirty-three percent is not." *Id.* at 424.

Anticompetitive conduct is "conduct designed to destroy competition, not just to eliminate a competitor." *Richter,* 691 F.2d at 823. Specific intent requires proof that a defendant aimed "to destroy competition or build monopoly." *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). Merely showing that defendant desired to increase market share does not satisfy this standard. *See United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977).

The presence of a dangerous probability of success is closely linked to a defendant's market share. Establishing that the defendant has a significant share of the market is an essential part of an attempted monopolization claim. "In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power—the ability to control prices and exclude competition." *Richter,* 691 F.2d at 826. A corollary to this principle is that anticompetitive acts by firms without a dangerous probability of successfully monopolizing the market are beyond the reach of § 2. *See ABA Antitrust Section, Antitrust Law Developments* (2d ed. 1984) at 141–42 and cases cited therein.

### 3. Conspiracy to Monopolize

Elements of a claim for conspiracy to monopolize are 1) the existence of a combination or conspiracy; and 2) specific intent to monopolize. *Richter,* 691 F.2d at 826. Both elements may be established by either direct or indirect proof. *See American Tobacco Co. v. U.S.,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946). Proof of a dangerous probability of success is not necessary to establish a conspiracy claim. However, where the defendants' actions are ambiguous and could be motivated by factors other than an attempt to monopolize, the likelihood of success is a

factor in determining whether the defendants had the requisite specific intent to monopolize. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926–27 (9th Cir. 1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). *See also Bailey's, Inc. v. Windsor America, Inc.,* 948 F.2d 1018 (6th Cir.1991) ("wildly improbable" that defendant's actions were motivated by intent to monopolize when it held less than 10% of the relevant market share).

### C. Analysis

After extensive review, the Court determines that plaintiffs' claims for monopolization, attempted monopolization and conspiracy to monopolize do not raise genuine issues of material fact. Therefore, the Court grants summary judgment to defendants on all § 2 claims.

Plaintiffs' claims suffer from two equally serious flaws, either of which would support a grant of summary judgment. First, the claims rest upon plaintiffs' expert's statistics and conclusions which are not supported by a credible economic or demographic foundation. Second, even if the statistical claims were accepted in full, they do not raise genuine issues of material fact sufficient to meet the "stiff burden," *Langenderfer,* 917 F.2d at 1422, imposed upon plaintiffs to establish a § 2 claim.

### 1. Plaintiffs' Expert Testimony

Plaintiffs' expert, economist Dr. Donald Martin, identified two product markets: the market for residential real estate brokerage services and the market for recruiting and retention of "experienced and successful" sales agents.[9] He defined Northeast Ohio as having 161 geographic markets, corresponding to the 161 "municipalities, townships and local areas" identified by the Northeast Ohio Multiple Listing Service (NORMLS). He justified his narrow delineation of the geographic markets[10] on his observation that real estate companies usual-

---

9. These markets correspond with the markets named in paragraphs 13 and 14 of plaintiffs' Second Amended Complaint and in paragraphs 14 and 15 of intervening plaintiffs' Third Amended Complaint.

10. Dr. Martin admitted that although he had defined relevant markets more than 100 times, he had never fragmented a geographic area to this extent. (Depo. of Martin at 717).

ly set up offices in individualized areas and that local familiarity is essential to being a successful sales agent. He noted further that "the geographic market in which agents conduct most of their business is very local" (Martin Report at 24) and that a Federal Trade Commission survey indicated that 70% of agent-assisted sales came from residential property sellers living within five miles of the agents' offices.[11]

Dr. Martin defined defendants' market shares in each of the 161 geographic markets as their respective percentages of the total dollar volume of residential sales of NORMLS listings from January 1, 1993, through August 4, 1995. He identified 21 markets in which Smythe Cramer had a market share of at least 40% and 34 markets in which Realty One had a market share of at least 40%. According to Dr. Martin, Realty One and Smythe Cramer have monopoly power in any market in which one of them had at least a 39% market share and the next largest competitor had a share at least 10 percentage points fewer. (Depo. of Martin at 365–66). This particular definition of mar-

ket power was created by Dr. Martin, who had never published or previously used such a definition and could provide no economic or peer review literature to back it up. (*Id.* at 780–85).[12]

Based upon Dr. Martin's report and deposition testimony, Plaintiffs have not met their burden of defining the relevant geographic market. While it may be true that the residential real estate industry is essentially a local business, the rote adoption of the 161 geographic areas used by NORMLS for statistical purposes does not satisfy Plaintiffs' responsibility to identify geographic markets which correspond to commercial realities of the industry and are economically significant.[13] *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). By choosing to justify his geographic market definition with broad generalizations that "the geographic market in which agents conduct most of their business is very local" (Martin Report at 24), Dr. Martin fails to offer evidence that the particular geographic areas he defines are true independent markets.[14]

11. The FTC report to which Dr. Martin cites was prepared by the FTC's Los Angeles regional office. No mention is made in the record whether it reflects local or national trends.

12. Dr. Martin said that the Department of Justice merger guidelines stating that a market share in the neighborhood of 40% "implies monopoly power" supports the first part of his definition. (Depo. of Martin at 782). He cited no support for the second part of the definition, i.e., that market share must be at least ten percentage points higher than the nearest competitor.

13. Cases cited by plaintiffs to support the division into 161 geographic markets are unconvincing. In *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566 (11th Cir.1991), *cert. denied,* 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992), plaintiffs argued successfully a geographic market for multilist services in Atlanta could be the south side of the city rather than the entire city. Allowing a city the size of Atlanta to be split into two (or even several) submarkets is a far cry from allowing a region to be divided into 161 submarkets. Plaintiffs also cite *S.W. Suburban Bd. of Realtors v. Beverly Area Plan.,* 830 F.2d 1374 (7th Cir.1987), but that case merely stood for the proposition that a multiple listing service had standing to sue for alleged antitrust violations. It explicitly did not address the merits of the complaint. *Id.* at 1382.

14. The fact that a region may be divided into submarkets does not relieve a plaintiff's burden to define markets which correspond to commercial reality and are economically significant. This proposition was made clear in *White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495 (6th Cir.1983):

> The fundamental error of the district judge in delineating the geographic market ... was the mistaken premise that the standard market tests may be abandoned or ignored and replaced with a less demanding "submarket test." Von Kalinowski, in his standard treatise ..., clearly refutes the lower court's supposition:
> > This concept, that a relevant submarket may constitute the geographic market for Section 2 purposes, does not, however, mean that a new test has been promulgated for determining the relevant geographic market. It merely emphasizes the general rule that although the geographic market in some instances may encompass the entire nation, under other circumstances it may be a much smaller area, i.e., a relevant submarket.
> *Antitrust Laws and Trade Regulation* § 8.01[2], at 8–27 (footnotes omitted).
> Accordingly, the proper criteria for defining a geographic market is that area in which the seller operates, and to which the purchaser can practicably turn for supply. While that area is not ordinarily susceptible to a metes

Dr. Martin lacked any meaningful knowledge about the population, geographical size, commercial activity or demographic statistics of the 161 geographic markets he defined. The markets ranged from tiny suburbs with population of less than 1,000 to cities the size of Lorain (pop. 71,000). Moreover, there is no evidence in the record that home sellers or buyers obtain real estate brokerage services exclusively or even largely from brokers within their specific NORMLS geographic area. Nor is there evidence that brokers within the named geographic areas do not compete with outside brokers for the sale of homes within other geographic areas. Some geographically connected suburbs are substantially similar in size, demographics and home values. There is no reasonable explanation why they should be separated into distinct geographic submarkets.

Even if the Court were to accept the arbitrary classification of northeast Ohio into 161 geographic markets for residential real estate services, Dr. Martin's statistics are skewed. First, he derived his market share from the percentage of the *dollar value* of homes sold rather than from a percentage of homes actually sold. Second, his statistics cover a 32–month period from 1993 to 1995, while this lawsuit is based upon and seeks damages from events dating back to 1987. Third, he derived his percentages solely from the sales of homes posted on NORMLS. Such an approach ignores the fact that a significant amount of residential real estate transactions are conducted each year without the use of the multiple listing service.[15] The percentages therefore cannot be said to reliably reflect the defendants' true market share.

■ Dr. Martin's attempt to establish the same 161 geographic areas as the relevant geographic markets for recruiting and retaining real estate agents fails for the same reasons. There is no evidence that the brokers who recruit agents restrict their searches to Dr. Martin's particularized geographic communities.

In sum, Plaintiffs have failed to adequately define a relevant geographic market to support their monopolization claims. This is fatal to the claims. In the interest of thoroughness, however, the Court does not rest its conclusion merely on the infirmities of the market definition. Even if the Court were to accept for the sake of argument that 1) Dr. Martin had adequately defined the geographic markets and 2) that the market shares he attributes to defendants were valid, the monopolization claims still would fail as a matter of law.

### 2. The Status of Re/Max Int'l and Re/Max NE Ohio

■ In its May 10, 1995, memorandum opinion, the Court held that Re/Max Int'l lacked standing to assert claims for "damages flowing from the alleged injury inflicted on the market for residential real estate services in Northeast Ohio." *Re/Max Int'l*, 900 F.Supp. 132, 169 (N.D.Ohio 1995). The Court's extensive analysis concluded that Re/Max Int'l failed to demonstrate that its claims related to this market fell within the area of congressional concern to entitle it to bring a private enforcement action. *Id.* The Court reasoned, *inter alia*, that as a franchisor which did not even have a license to compete in the market for residential real estate services, Re/Max Int'l was neither a direct victim of alleged anticompetitive conduct, nor was its asserted injury "inextricably intertwined" with the injury allegedly sought to be inflicted upon that market. *Id.* at 167. The Court went on to hold that Re/Max Int'l did have standing to assert a claim in the market for recruiting and retention of real estate agents and brokers. *Id.* at 170. The Court's holding applies equally to Re/Max NE Ohio, a subfranchisor which, like

and bounds definition, it is the area in which producers effectively compete.
*White & White*, 723 F.2d at 502–03 (citations omitted).

**15.** Realty One provides statistical evidence indicating that in calendar year 1993, only about 60% of the residential sales in Bay Village, Fairview Park, Lakewood, North Olmsted and Westlake (five communities in which Realty One is accused of having monopoly power) were from homes listed on NORMLS.

Re/Max Int'l, does not compete in the market for residential real estate services.[16]

Re/Max Int'l and Re/Max NE Ohio insist that despite the Court's prior ruling, they can assert claims for damages flowing from alleged anticompetitive conduct in the market for residential real estate brokerage services. They now offer a "leveraging" theory that defendants' conduct in that market injures them in the market for recruiting and retaining real estate agents and brokers. The Court believes its May 10 ruling was clear: it denied Re/Max Int'l "standing ... to complain of harms resulting from antitrust injuries to the market for residential real estate services in Northeast Ohio." The Court does not know any other way to say it: Re/Max Int'l (and Re/Max NE Ohio) cannot assert claims based on alleged anticompetitive acts in the market for residential real estate brokerage services.[17] To allow the leveraging claim would render the Court's prior ruling meaningless.

This leaves Re/Max Int'l and Re/Max NE Ohio solely with claims for damages in the market for recruiting and retaining agents and brokers, and they failed to produce evidence establishing that Realty One or Smythe Cramer monopolized, attempted to monopolize or conspired to monopolize that market.[18]

In sum, because Re/Max Int'l and Re/Max NE Ohio lack standing to assert claims based on damages flowing from injuries allegedly inflicted on the market for residential real estate brokerage services, and because they have no evidence to support claims based on injuries allegedly inflicted on the market for recruiting and retention of agents and brokers, their § 2 claims fail completely. All that remains of the § 2 counts are the claims of the plaintiff franchisees against the two defendants.

### 3. The Monopolization Claims

#### a. Property Professionals v. Smythe Cramer

Property Professionals is located in Hudson and does business in both Hudson and Aurora. According to Dr. Martin's statistics, Smythe Cramer has market shares of 39.1% in Hudson and 46.2% in Aurora. Property Professionals claims that these market shares, in the context of the "unique nature" of the real estate industry, establish that Smythe Cramer enjoyed market power in those communities. (Response Memorandum, Docket No. 334, at 24).

16. The Court's May 10 holding did not address Re/Max NE Ohio because, as a late entrant into the case, it was not the subject of a motion for partial summary judgment on the standing issue at that time.

17. It is difficult to conceive that Re/Max Int'l and Re/Max NE Ohio misperceived the nature of Court's earlier holding on Re/Max Int'l's standing. The Court engaged in an extensive discussion of the standing doctrine and applied the facts of this case to the principles of law before concluding Re/Max Int'l could not assert the type of injury meriting standing.

The Court also questions plaintiffs' contention that, in attempting to leverage injury in one product market into damages in a second market, they are simply asserting what they claimed from the outset in paragraphs 13 and 14 of the Second Amended Complaint. Paragraph 14 alleges, "Defendants' unlawful acts have also *occurred in,* and have affected, commerce in the relevant product market for the recruitment and retention of experienced and knowledgeable residential real estate sales agents ..." (emphasis added). For Re/Max to now argue that it "has never asserted a claim that [defendants have] monopolized or attempted to monopolize any

agent market" (Response Memorandum, Docket No. 330, at 16) is disingenuous.

In any event, the Court finds the purported leveraging claim unpersuasive. Plaintiffs correctly point out that they need not show that defendants have monopoly power in the "leveraged" market, i.e., the agent market. *Kerasotes Mich. Theatres v. National Amusements,* 854 F.2d 135, 137 (6th Cir.1988). However, they do need to show at least a distortion of the leveraged market as a result of monopolization of the original market. *See id.,* (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)). This they have failed to do in other than broad, conclusory fashion. Finally, even if plaintiffs' argument had merit, it is late in the game for Re/Max Int'l and Re/Max NE Ohio to frame a claim for leveraging a monopolistic practice in one market into a claim for damages in another market when they have not clearly asserted it in the two years this case has been ongoing.

18. There is no evidence of the respective parties' shares in the market for recruiting and retaining real estate agents.

The "unique nature" of the real estate industry purportedly derives from the vertical relationships established among competitors via cooperative transactions. These relationships allegedly permit Smythe Cramer to use its relatively large share in the Hudson and Aurora markets to control prices and exclude competition. For example, Property Professionals alleges that Smythe Cramer imposes adverse commission splits on brokers attempting to offer discount commissions, a practice that deters competitors from reducing prices and causes prices to stay above competitive levels.

Property Professionals' argument that the "unique characteristics" of the real estate industry permit a finding of a monopoly ignores the fact that other characteristics of the industry make the establishment of a monopoly far more difficult. For example, anyone who passes a state licensing test can enter the field, and the overhead required to establish an office is minimal compared to that of most other industries. The sheer volume of real estate companies and offices is indicative of the relative ease of entry into the field.

Recognizing the uphill battle it faces to establish the existence of a monopoly in light of Smythe Cramer's market shares, Property Professionals argues that there is no *per se* rule that a certain percentage of market share is necessary to establish a monopoly. While this is true, Property Professionals cites no Sixth Circuit authority finding a monopoly in a market in which the defendant had less than a 50% market share. To the contrary, there is ample authority establishing at least a clear presumption that market shares below 50% to 60% do not constitute a monopoly.[19] The evidence in this case does not overcome that presumption.

Monopoly power is the power to "control prices or exclude competition." *duPont,* 361 U.S. at 391. While Smythe Cramer can control its own prices and set its rates on commission splits, there is no evidence that its policies have controlled market prices or excluded competition. If Smythe Cramer were successfully controlling prices, one would expect to see higher overall commission rates in areas in which Smythe Cramer has a monopoly than in areas in which it lacks a monopoly. No such evidence has been presented. Excluding competition requires more than adopting policies which tend to harm specific competitors. Indeed, after years of alleged anticompetitive activity, Smythe Cramer still possesses well under half the market share in both communities, and there is no evidence of a steadily increasing market share for Smythe Cramer as a result of its policies.

In sum, Property Professionals has failed to show that Smythe Cramer has monopoly power in Hudson or Aurora. Therefore, its claim of monopolization fails.

### b. *Five Franchisees v. Realty One*

Plaintiffs allege that Realty One has willfully acquired and maintained monopoly power in the market for sale of residential real estate in twelve western Cleveland suburbs: Bay Village, Westlake, North Olmsted, Lakewood, Fairview Park, Avon, Avon Lake, Sheffield, Sheffield Lake, Amherst, Lorain and Elyria. (Plaintiffs' Second Amended Complaint at ¶ 57; intervening plaintiffs' Third Amended Complaint at ¶ 58).

Plaintiffs' response to Realty One's summary judgment motion fails to point out which franchisees do business in these communities. Such a showing is vital to establishing whether the individual franchisees are harmed by Realty One's alleged monopoly in a specific community.

Plaintiffs did not dispute Realty One's contention that only three franchisees maintained an office in or adjacent to those twelve geographic areas: Re/Max Affinity in Westlake, Realty Properties in Westlake and True Partnership in Bay Village.[20] A party cannot assert a monopolization claim without proving it realistically is in the market it postu-

---

**19.** See discussion at pages 1488–89 *supra.*

**20.** According to its original pleading, Zames Realty (apparently now known as Re/Max Specialists in Real Estate) is located in Mentor. REP's location was not stated in its original pleading. Plaintiffs do not dispute Realty One's statement that REP's office is located in Broadview Heights.

lates. *Langenderfer,* 917 F.2d at 1423. Franchisees Zames Realty and REP have not shown they are in the markets alleged to be·monopolized by Realty One. Their claims are thus without merit.

■ Still to be considered are plaintiffs' claims that Realty One monopolized the Westlake and Bay Village markets. According to Dr. Martin's statistics based on dollar value of NORMLS listings, Realty One's market share is 48% in Westlake and 50.6% in Bay Village. Those percentages are not sufficient to rebut the presumption of no monopoly,[21] particularly when there are no statistics indicating whether Realty One's market share increased after initiating the alleged anticompetitive activity and there is no evidence that there were true entry barriers to the real estate industry.[22]

Accordingly, the monopoly claims of all five franchisees fail.

### 4. The Attempted Monopolization Claims

■ The attempted monopolization claims of Property Professionals against Smythe Cramer and the five franchisees against Realty One suffer from the same infirmity: they fail to establish that the defendants had either a specific intent to monopolize or a dangerous probability of success. Construing the evidence favorably toward the plaintiffs, the ACS could be interpreted as an effort to drive the plaintiffs out of business. However, monopolization is the destroying of *competition,* not the destroying of a competitor. *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). Evidence of targeting a single competitor for destruction, without more, is not evidence of an attempt to destroy competition, particularly in a marketplace featuring a significant number of competitors.

This is particularly true because plaintiffs have failed to establish that either Smythe Cramer or Realty One has a dangerous probability of success in achieving monopolization. The alleged anticompetitive acts began in 1987 and continue to this day. Yet plaintiffs fail to present evidence showing whether the market share of defendants has grown since 1987. Finally, the relative ease of entry into the real estate field, evidenced by the presence of large numbers of real estate companies in most communities, further refutes any inference that Smythe Cramer or Realty One has a dangerous probability of achieving monopolization. The defendants' predominance in certain communities is not tantamount to monopolization or near-monopolization.

### 5. The Conspiracy to Monopolize Claims

■ Plaintiffs' failure to establish the specific intent element necessary for an attempted monopolization claim is likewise fatal to their conspiracy to monopolize claims. Essentially the plaintiffs ask the Court to infer the specific intent to establish a § 2 violation from variations on a single business practice—the imposition of adverse splits on competitors. Without more, and given the fact that there may be legitimate business reasons for such action, plaintiffs fail to establish that defendants specifically intended to establish monopolies.

The conspiracy claim suffers from a second infirmity as well. A § 2 claim of conspiracy requires an agreement *to monopolize.* Plaintiffs have not raised a genuine issue that any purported agreement by the two competitors would have been made to enhance the alleged monopolization goals of either defendant.

**21.** True Partnership might argue that the 50.6% figure in Bay Village takes that community out of the *Langenderfer* presumption, which found substantial merit in a presumption that market shares "below 50 or 60 percent" do not constitute monopoly power. This Court does not find that edging over the 50% level justifies evaluating True Partnership's claim by a different standard. Moreover, Dr. Martin's statistics for Bay Village are particularly suspect because his figures were based on the years 1993 through 1995. True Partnership went out of business prior to 1993.

Thus there is no evidence of Realty One's market share when True Partnership was competing in the geographic area.

**22.** Any claim that the alleged anticompetitive activity of the defendants produced barriers to entering the real estate field rings hollow in light of the fact that most of the plaintiff franchisees were formed *after* the alleged anticompetitive activity began in 1987.

Thus no plaintiff has raised a genuine issue of material fact to support claims of monopolization, attempted monopolization or conspiracy to monopolize. Defendants' motions for summary judgment are granted with respect to all monopoly claims (Counts II, III, IV, V and VI).

## V. PLAINTIFFS' CONSPIRACY CLAIMS

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, applies to any "contract, combination ..., or conspiracy" between two or more persons to unreasonably restrain trade in interstate commerce. Similarly, Ohio's Valentine Act, O.R.C. § 1331.01 *et seq.*, prohibits trusts, which are defined as "a combination of capital, skill or acts by two or more persons ... to create or carry out restrictions in trade or commerce." Plaintiffs allege that defendants conspired to restrain plaintiffs' competition in the Northeast Ohio marketplace in violation of both § 1 of the Sherman Act and § 1331.02 of the Valentine Act.

Although the federal and state statutes are worded slightly differently, the goals are the same. Both condemn combinations having for their purpose restraints on trade or commerce. Ohio courts interpret the Valentine Act in light of federal judicial construction of § 1, citing federal Sherman Act cases to support Valentine Act holdings. *See, e.g., C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St.2d 201, 204, 407 N.E.2d 507 (1980). Consequently, an analysis based upon the Sherman Act will encompass the Ohio claims as well. *See Richter Concrete Corp. v. Hilltop Basic Resources*, 547 F.Supp. 893, 920 (S.D.Ohio 1981), *aff'd*, 691 F.2d 818 (6th Cir.1982) (plaintiff's failure to prove its claims under Sherman Act constitutes a failure to prove the claim under the Valentine Act).

To establish a § 1 violation, a plaintiff must establish 1) a contract, combination or conspiracy; 2) affecting interstate commerce; 3) which imposes an unreasonable restraint on trade. *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983). There are two standards for evaluating whether a restraint of trade is unreasonable: the rule of reason and the *per se* rule. *See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342, 110 S.Ct. 1884, 1893–94, 109 L.Ed.2d 333 (1990); *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986). Under the rule of reason, the plaintiff bears the burden of establishing the challenged activity's unreasonable effect on competition. Under the *per se* rule, the challenged activity's unreasonableness is presumed. The nature of the restraint determines which rule will be applied. *Atlantic Richfield Co.*, 495 U.S. at 342, 110 S.Ct. at 1893–94. In the instant case, plaintiff allege that Realty One and Smythe Cramer, as horizontal competitors in the marketplace, have conspired to set the prices they pay to Re/Max franchisees for cooperative transactions. A horizontal conspiracy to fix prices is a type of restraint which falls under the *per se* standard. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Therefore, assuming plaintiffs could prove a conspiracy to set prices, they would not have to prove further the unreasonable impact on commerce such conspiracy would have.

It is critical to establish that there has been a contract, combination or conspiracy between separate entities. Unilateral conduct, even if it unreasonably restrains trade, does not violate § 1. *Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605, 611 (6th Cir.1990), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984)). Unilateral conduct is governed by § 2 of the Sherman Act and is unlawful only when it threatens actual monopolization. *Copperweld Corp.*, 467 U.S. at 768, 104 S.Ct. at 2740.

To support a claim of antitrust conspiracy, a plaintiff must present evidence that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775

(1984). A plaintiff lacking direct evidence may use circumstantial evidence to infer the existence of a conspiracy through business behavior indicating "a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful arrangement." *Nurse Midwifery,* 918 F.2d at 616 (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The mere fact that a group of defendants' conduct is consistent with an illegal conspiracy does not support an inference of antitrust conspiracy. *Id.; Nurse Midwifery,* 918 F.2d at 616. To survive summary judgment, a plaintiff must present evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471). In other words, the nonmoving party "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356–57.

■ Based upon *Monsanto* and *Matsushita,* the Sixth Circuit has adopted a two-part inquiry to determine whether circumstantial evidence can support an inference of conspiracy: 1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy, and if so, 2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests? *Riverview Investments v. Ottawa Community Imp.,* 899 F.2d 474, 483 (6th Cir.), *cert. denied,* 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990).

Examples of evidence which could "tend to exclude the possibility" of independent conduct include actions contrary to a defendant's economic self-interest, product uniformity, exchange of price information, opportunity to meet, a large number of communications and a common motive to conspire. *Wallace v. Bank of Bartlett,* 55 F.3d 1166, 1168 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996). The presence of one or more of these "plus factors" helps raise an inference that the activities of two or more defendants was concerted. *See id.*

Yet it is important to note that the presence of one or more of these "plus factors," in and of itself, is not sufficient to preclude judgment as a matter of law. In *Wallace,* plaintiffs alleged that a group of banks conspired to keep fees for writing checks on insufficient funds artificially high. The Sixth Circuit noted that plaintiffs offered as circumstantial evidence "plus factors" such as exchange of price information and common motive to conspire. However, the appeals court, in affirming the district court's grant of summary judgment, noted that the banks provided legitimate business reasons for the presence of those factors, and plaintiffs failed to establish that the circumstantial evidence tended to exclude the possibility of independent conduct. *Wallace,* 55 F.3d at 1169–70.

In *Nurse Midwifery,* midwives alleged that a doctor and a hospital conspired to deny the midwives hospital privileges. The district court found two "plus factors" present: the defendants had both a motive and an opportunity to conspire. However, the court further found that the defendants' alleged conduct was equally consistent with defendants' stated and legitimate reason for the denial. The district court's granting of summary judgment was affirmed by the Sixth Circuit, which noted that plaintiffs did not explain how their circumstantial evidence tended to exclude the possibility that the privileges were denied for legitimate reasons. *Nurse Midwifery,* 918 F.2d at 617.[23]

---

23. In the same multidefendant case, the Sixth Circuit held that the district court did not abuse its discretion in denying summary judgment to two defendant hospitals which were pursuing an interlocutory appeal. The district court based its denial of summary judgment upon the plaintiffs' showing of issues of material fact that 1) the hospitals' business activities constituted parallel conduct; 2) the hospitals had a motivation to enter into a conspiracy; and 3) the actions taken

In *Riverview,* a real estate developer alleged a community development corporation's refusal to issue industrial revenue bonds was the product of an illegal agreement among its members to restrain commerce. After a jury awarded $350,000 to the developer, the court entered judgment notwithstanding the verdict in favor of the defendants. The Sixth Circuit noted that some of the defendants had a common motive to conspire and all of them had opportunities to meet. However, those factors, in the context of the case, did not tend to exclude the possibility of independent conduct: "All may be *consistent* with conspiratorial conduct but . . . proving that conduct is consistent with a conspiracy is not sufficient to allow an inference of conspiracy absent some evidence which tends to exclude the possibility that conduct is independent." *Riverview,* 899 F.2d at 485 (emphasis in original). The appeals court thus affirmed the grant of j.n.o.v.

Thus the Sixth Circuit precedent counsels that the mere presence of "plus factors" is not enough to survive a summary judgment challenge unless those plus factors tend to exclude the possibility of independent conduct. In light of *Matsushita, Monsanto* and Sixth Circuit precedent, summary judgment is often appropriate even in complex antitrust § 1 cases because of the "limits [on] the range of permissible inferences from ambiguous evidence." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356.

■ Plaintiffs thus face the burden of establishing a genuine issue of material fact of a conspiracy either by 1) direct evidence, or 2) circumstantial evidence which tends to exclude the possibility that Realty One and

Smythe Cramer acted alone in imposing the ACS. If they rely on circumstantial evidence, they "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356–57. This is consistent with Sixth Circuit summary judgment principles which state that the nonmoving party must present sufficient evidence for a jury to return a verdict for that party. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)).

■ Plaintiffs argue that the circumstantial evidence includes a number of *Wallace* "plus factors" which support an inference of conspiracy. Chief among such factors is the purported parallel pricing of Realty One and Smythe Cramer in imposing a similar ACS within six weeks of each other in 1987.

Parallel pricing is not enough in itself to raise an inference of conspiracy. However, plaintiffs argue there were other "plus factors" present, such as common motive, exchange of price information[24] and opportunities to meet.[25]

As evidence of common motive, plaintiffs offer the report of Dr. Martin, their expert economist, who theorized that it did not make economic sense for either defendant to impose and maintain the ACS without knowing that the other would do the same. How-

---

were contrary to the hospitals' individual economic interests. *Nurse Midwifery Associates v. Hibbett,* 689 F.Supp. 799, 808–09 (M.D.Tenn. 1988), *aff'd in relevant part,* 918 F.2d 605 (6th Cir.1990), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991).

**24.** Realty One sent a letter to multiple listing service members in December 1992 announcing that it was adopting the practice of "buyer agency." It announced that it was changing its prior policy of providing a lesser commission split on its listed property to brokers serving as buyer's agents than it provided to brokers serving as seller's agents. However, it added that it would continue to impose adverse splits on any agen-

cy—whether its brokers were seller's agents or buyer's agents—to which it had provided written notice of ACS in the past. Plaintiffs contend that the latter information was Realty One's way of informing Smythe Cramer that it was continuing its ACS policy on Re/Max franchisees.

**25.** Plaintiffs note that the Vince Aveni, Realty One's chief executive officer, and Lucius McKelvey, Smythe Cramer's chief executive officer, were partners in a real estate newspaper. They also were observed conversing privately for several minutes at an annual meeting of CABOR in the spring of 1987 at approximately the time their companies decided to impose the ACS.

ever, upon questioning from Smythe Cramer's counsel, Dr. Martin implicitly admitted that imposing the ACS could have been in Smythe Cramer's individual best interest:

Q: [Suppose] Smythe Cramer decides ... not [to] adopt the policy that it, in fact, did [the ACS]. Would Re/Max franchisees have been more successful in taking sales agents from Smythe Cramer?

A: I expect that they would.

Q: Do you know how much more successful they would have been?

A: I don't have a number associated with that.

Q: Would that have been an unfavorable outcome for Smythe Cramer in your view?

A: Any time a competitor in the labor market ... has to pay a competitive— any time he has to pay a higher price for those resources because competition forces those resources up, he's worse off, yes.

(Depo. of Martin at 691). Because Smythe Cramer (and presumably Realty One) would likely have continued to sustain losses at the expense of Re/Max franchisees in the absence of action, the fact that both imposed the ACS is of little value in tending to exclude the possibility of independent conduct.

In addition to this cross-examination of Dr. Martin, Defendants presented expert testimony to the effect that independent imposition of the ACS was a sensible business response to Re/Max's recruitment of defendants' top agents. Thus the purported parallel pricing is at best "ambiguous," i.e., it is "as consistent with the defendants' permissible independent interests as with an illegal conspiracy." *Riverview,* 899 F.2d at 483.

Nor do the other alleged "plus factors" tend to exclude independent conduct. Each has a reasonable explanation independent of conspiracy. In the words of *Riverview,* "All may be *consistent* with conspiratorial conduct but ... proving that conduct is consistent with a conspiracy is not sufficient to allow an inference of conspiracy absent some evidence which tends to exclude the possibili-

ty that the conduct is independent." *Id.* at 485 (emphasis in original).

Considered as a whole, the purported "plus factors" present no more than a scintilla of circumstantial evidence of conspiracy, not enough "for a jury to return a verdict" for plaintiffs. *J.C. Bradford & Co.,* 886 F.2d at 1477. Thus the circumstantial evidence does not present sufficient evidence of conspiracy to survive summary judgment.

Plaintiffs alternatively offer "direct" evidence which they argue is sufficient to deny summary judgment. This evidence comes in the affidavit and deposition testimony of Leo Lee, former general manager and member of the executive committee of Realty One. Lee attended a Realty One executive committee meeting in mid–1987, shortly after both defendants imposed the ACS on Re/Max franchisees. Lee testified that he asked Vince Aveni, then chief executive officer of Realty One, whether he was concerned about antitrust liability in light of the two large companies' parallel decision to impose the ACS on Re/Max franchisees. According to Lee's affidavit,

Vince replied that there was no need to worry because someone would have to prove that he had talked to L.B. McKelvey (the principal shareholder of Smythe Cramer). He then leaned forward, smiled and said, "Of course[,] we didn't." Although cast as a denial of any wrongdoing, the real thrust of Aveni's response was as a non-verbal affirmation that an agreement had in fact been made.

(Affidavit of Lee at ¶ 14). He stated further during his deposition, "Vince gave me the impression that he had done it, no one had seen it and we didn't have to worry about it." (Depo. of Lee at 86).

Defendants dispute the contention that Lee's testimony constitutes "direct" evidence of conspiracy. They argue that Lee's recounting of Aveni's statements and/or actions is inadmissible hearsay and improper opinion evidence. Plaintiffs argue that the statement and accompanying actions are admissible under Fed.R.Evid. 801(d)(2)(E), which considers as non-hearsay statements by a co-conspirator during the course of and in furtherance of a conspiracy.

The key case on admissibility of the testimony of a co-conspirator is *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *Bourjaily* held that a trial court could consider the content of a co-conspirator's statement when determining whether a conspiracy existed. Importantly, however, *Bourjaily* restricted its holding to situations where the co-conspirator's statement helped corroborate other evidence of conspiracy. The Court stated, "We need not decide in this case whether the courts below could have relied *solely* upon [declarant's] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence." *Id.* at 181, 107 S.Ct. at 2781. (emphasis added).

*Bourjaily* thus left open the question of whether an alleged conspiratorial statement can be admissible to establish a conspiracy in the absence of corroborating evidence. However, appellate courts which have considered the issue, including the Sixth Circuit, have unanimously held that establishment of a conspiracy requires some evidence in addition to the contents of the statement. *See United States v. Clark,* 18 F.3d 1337, 1341–42 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 152, 130 L.Ed.2d 91 (1994); *United States v. Beckham,* 968 F.2d 47, 51 (D.C.Cir. 1992); *United States v. Sepulveda,* 15 F.3d 1161, 1181–82 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *United States v. Zambrana,* 841 F.2d 1320, 1344–45 (7th Cir.1988); *United States v. Silverman,* 861 F.2d 571, 577 (9th Cir.1988); *United States v. Hernandez,* 829 F.2d 988, 993 (10th Cir.1987), *cert. denied,* 485 U.S. 1013, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988); *United States v. Byrom,* 910 F.2d 725, 736 (11th Cir.1990).[26]

■■■■ Assuming *arguendo* that Lee's testimony of Aveni's "smile" would constitute evidence of conspiracy, the statement is inadmissible against the alleged co-conspirator, i.e., Smythe Cramer, for two reasons. First, in order to admit a statement of a co-conspirator the movant must establish 1) that a conspiracy existed, 2) that the defendant was a member of the conspiracy, and 3) that the co-conspirator's statements were made in furtherance of the conspiracy. *U.S. v. Pierce,* 62 F.3d 818, 827 (6th Cir.1995) *cert. denied,* —— U.S. ——, 116 S.Ct. 965, 133 L.Ed.2d 886 (1996) (citation omitted). The district court must make these determinations under a preponderance of the evidence standard. *Id.* (citing *Bourjaily,* 483 U.S. at 175, 107 S.Ct. at 2778–79). Corroborating evidence aside from the statement itself must be proffered to prove the existence of the conspiracy. *Clark,* 18 F.3d at 1341–42.

■■■■ The Court must determine whether corroborating evidence exists to support the introduction of Lee's testimony. A case from the Ninth Circuit, *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432 (9th Cir.1990), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991), is instructive for making such a determination in the antitrust context. *Petroleum Products* held that "evidence of conduct that is completely consistent with defendant's unawareness of the conspiracy cannot serve as corroborating evidence under Rule 801(d)(2)(E)." *Id.* at 459 (citation omitted.) If the purported corroborated evidence is circumstantial in nature, the Ninth Circuit applies the following standard: "In the antitrust context the [corroboration] requirement can be met if the circumstantial evidence offered in addition to the co-conspirator's statements is adequate to defend against summary judgment under *Matsushita* .... This requirement comports with the ... mandate against allowing wholly innocuous conduct alone to serve as proof of conspiracy." *Id.* at 459 (citation omitted). This Court has decided that the circumstantial evidence proffered by plaintiffs is insufficient to survive summary judgment. Under the

**26.** In recognition of this overwhelming weight of authority, the preliminary draft of the proposed amendments to the Federal Rules of Evidence would incorporate the extrinsic evidence requirement. The draft reads: "The comments of the statement [by a co-conspirator] may be considered but are not alone sufficient to establish ... the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." Rule 801(d)(2), Preliminary Draft of Proposed Amendments to the Federal Rules of Evidence.

analysis in *Petroleum Products,* which the Court finds persuasive, such evidence cannot be used to support an otherwise uncorroborated statement of a co-conspirator.

In addition to its inadmissibility on the foregoing grounds, Lee's testimony of Aveni's "smile" suffers from a second fatal infirmity. Rule 801(d)(2)(E) requires the statement to be "during the course *and in furtherance of* the conspiracy" (emphasis added). Plaintiffs offer no credible evidence that the purported smile in any way furthered the alleged conspiracy. *See United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976) ("casual admission of culpability" in no way furthered conspiracy). There is no evidence Aveni intended to draw Lee into the alleged conspiracy or enlist Lee to help accomplish the alleged conspiracy's objectives.[27]

Consequently, Lee's statement is not admissible as direct evidence of conspiracy. Plaintiffs are left with no direct evidence and inadequate circumstantial evidence to support a denial of defendants' motion for summary judgment. Accordingly, the motion is granted with respect to the conspiracy counts (Counts I and VII).

## VI. PLAINTIFFS' STATE LAW CLAIMS

The final three claims are asserted by all plaintiffs against all defendants and are based in state law. Count VIII claims that defendants engaged in deceptive trade practices in violation of the Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.* Count IX asserts a common law claim of unfair competition. Count X is a claim for tortious interference with business relations.

### A. Deceptive Trade Practices

Plaintiffs claim defendants' conduct violated Ohio's Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.,* in two ways. They

claim defendants' failure to disclose the ACS to sellers constituted a misrepresentation of market characteristics in violation of § 4165.02(E), and that defendants' untrue statements about plaintiffs' policies and practices constituted disparagement in violation of § 4165.02(H).

### 1. Misrepresentation of Market Characteristics

O.R.C. § 4165.02(E) provides that a person engages in a deceptive trade practice when, in the course of his business, he "[r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have."

Plaintiffs contend that defendants, by failing to inform their customers that they impose the ACS on Re/Max franchisees, misrepresent the characteristics of the market of buyers. (Second Amended Complaint at ¶ 85; Intervenors' Third Amended Complaint at ¶ 86). In other words, defendants' customers, unaware of the ACS, do not realize that the potential market of buyers is diluted, presumably because Re/Max agents are less likely to work to find a buyer for the home.

This contention is without merit. First, defendants' listing contract with sellers explicitly states that the defendants reserve the right to split commissions in varying amounts depending upon the broker.[28] Thus there is no misrepresentation. Second, plaintiffs offer no evidence that the ACS practice in fact restricts the market as they claim. Several Re/Max agents testified to the contrary, i.e., that the ACS practice did not dissuade them from showing or selling defendants' listings.

Accordingly, the claim based upon misrepresentation of the characteristics of the market fails.

---

**27.** The Court does not feel compelled to accept plaintiffs' attempt to stretch the "smile" not only into an admission of a conspiracy, but an order not to discuss the conspiracy further with anyone in the future.

**28.** For example, Realty One's right to sell agreement includes this language in its second para-

graph: "Realty One is authorized in its sole discretion to determine with which brokers it will cooperate, and the amount of commission that it will offer cooperating brokers in the sale of the property. Sellers acknowledge that the commission offered to such cooperating brokers may vary from broker to broker."

## 2. Disparagement

O.R.C. § 4165.02(H) makes it a deceptive trade practice to "disparage[ ] the goods, services, or business of another by false representation of fact." Plaintiffs contend that defendants have violated this subsection in a number of ways, including stating 1) that plaintiffs do not carry sufficient errors and omissions insurance, 2) that the ACS was originated and used by plaintiffs, 3) that plaintiffs do not promote individual agent growth and betterment, and 4) that plaintiffs do not provide support and training to affiliated agents. (Second Amended Complaint at ¶ 31(e); Intervenors' Third Amended Complaint at ¶ 32(e)).

■ Defendants deny wrongdoing and assert that any alleged disparaging statements would have been protected by a qualified privilege. Ohio law attaches a conditional or qualified privilege to statements "fairly made by a person in ... the conduct of his own affairs, in matters where his interest is concerned." *Hahn v. Kotten,* 43 Ohio St.2d 237, 244, 331 N.E.2d 713 (1975).

■ Factors establishing a conditionally privileged communication include "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 8, 651 N.E.2d 1283 (1995).

■ The Court finds that defendants have established the existence of a qualified privilege in this case. The communications went toward a legitimate interest, i.e., retaining their agents. They were not disseminated to the general public and appear to have been communicated in a legitimate manner.

■ Plaintiffs contend that the privilege should not arise in this case because defendants and their agents do not share a common interest in communications designed to discourage employment with Re/Max franchises. However, Ohio law does not require the type of "common interest" to which plaintiffs allude. *Hahn* makes clear that a defendant has a right to communicate with parties with which it has a contract in an effort to maintain that contract, and "a qualified privilege arises when such communications are made *in which the person communicating has the interest." Id.* at 249, 331 N.E.2d 713 (emphasis added) (footnote omitted).[29]

■ Given the existence of a qualified privilege, plaintiffs must prove by clear and convincing evidence that the statements were made with actual malice. *Jacobs v. Frank,* 60 Ohio St.3d 111, 573 N.E.2d 609 (1991) (paragraph two of the syllabus). Actual malice goes beyond a showing of ill will or enmity; the plaintiff must prove that defendants made the statements with knowledge that they were false or with reckless disregard for their truth or falsity. *Id.*

■ The record confirms that both defendants aggressively sought to retain their agents in the face of what they viewed as a serious challenge by Re/Max. Smythe Cramer went so far as to produce a booklet called "The Reality" which was an extended comparison of Smythe Cramer and Re/Max. The booklet was critical of Re/Max's policies and practices. It attempted to show that despite Re/Max's "100% Concept," its agents did not earn significantly more than Smythe Cramer agents because of the hidden costs of being a Re/Max agent. In particular, it cast doubt upon whether Re/Max agents had sufficient backing when legal problems would arise.[30]

---

**29.** Although *Hahn* addressed a contract between an insurer and its insureds, the Court believes the interest of the defendants in retaining their agents is as strong as or stronger than the interest of the insurer in retaining its insureds.

**30.** Although "The Reality" did not state that Re/Max franchisees did not carry errors and omissions insurance, it did raise the issue of legal expenses. The booklet stated: "As Re/Max does not share in an agent's commission, the franchise

likewise will not share in an agent's Legal Problem Solving Expenses. National Association of Realtors (NAR) reports that the average lawsuit costs $6,000 for attorney fees and $3,000 for settlement, a total of $9,000. Remember, E & O Insurance does not include and cover many acts committed by agents. In 1988, Smythe, Cramer Co.'s settlement payments to clients and customers ranged from $246 to $24,000 per occurrence."

There is evidence that defendants discouraged their agents, and at least one agent not associated with them,[31] from pursuing employment with Re/Max franchisees. However, plaintiffs' claim is flawed in several respects. First and most importantly, Plaintiffs have not established that defendants' claims were made with actual malice. The evidence does not indicate by a preponderance, much less to a clear and convincing degree, that defendants were knowingly or recklessly spreading false information about defendants. There is no doubt that defendants conveyed to their agents hard-hitting, critical information about Re/Max policies. But that is to be expected in a competitive industry, and the Court does not find a genuine issue of material fact that the statements were made with actual malice. Second, plaintiffs are unable to even remotely articulate any specific damages from the alleged disparagement. The testimony they provide is from Re/Max agents who clearly were not dissuaded from associating with Re/Max. Finally, most of their claim consists of general accusations without attributing them to any specific defendant or claiming disparagement of any particular plaintiff. *See Sorin v. Board of Ed. of City School Dist. of Warrensville Heights,* 464 F.Supp. 50, 53 (N.D.Ohio 1978) (defamation of business claim must stated with specificity).[32]

Accordingly, plaintiffs' deceptive trade practices claim based upon disparagement fails. Summary judgment is awarded to both defendants in Count VIII.

### B. Unfair Competition

■ Plaintiffs allege that the imposition of the ACS and the disparagement of the Re/Max system constitute unfair competition under Ohio common law. (Second Amended

Complaint at ¶ 91; Intervenors' Third Amended Complaint at ¶ 92).

Under Ohio law, a claim of unfair competition is merely a common law counterpart to a statutory claim under the Deceptive Trade Practices Act. Consequently, a common law unfair competition claim is evaluated using the same analytical framework as a claim under the Deceptive Trade Practices Act. *See Cesare v. Work,* 36 Ohio App.3d 26, 28, 520 N.E.2d 586 (1987). *Accord, Jewel Companies, Inc. v. Westhall Co.,* 413 F.Supp. 994, 999 (N.D.Ohio 1976), *aff'd,* 575 F.2d 1176 (6th Cir.1978).

Plaintiffs' claims under Count IX thus fail for the same reason that their claims under the Deceptive Trade Practices Act fail. Defendants are entitled to summary judgment on Count IX.

### C. Tortious Interference With Potential Business Relations

Finally, plaintiffs claim that defendants have induced sellers to refuse to entertain or accept offers when a fair commission split for a Re/Max-affiliated agent is required. They allege that such conduct interferes with the prospective business relations of Re/Max Affinity, Re/Max Crossroads, Re/Max Results, Re/Max Xpress, Re/Max Key Realty and Re/Max Property Professionals. Further, they allege that defendants have made disparaging comments and otherwise induced sales agents not to affiliate with Re/Max, either as franchise owners or as sales agents. (Second Amended Complaint at ¶¶ 96, 97; Intervenors' Third Amended Complaint at ¶¶ 97, 98).

■ Under Ohio law, a cause of action for tortious interference with business relations is established when "one who, *without a privilege to do so,* induces or otherwise purposely causes a third party not to enter into,

---

31. Plaintiffs produced an affidavit from Re/Max Crossroads Realtor Ruth Mather who stated that, while she was an agent for Coldwell Banker Hunter Realty and contemplating a change in association, a Realty One officer warned her that Re/Max did not carry insurance for its agents. However, Mather joined Re/Max Crossroads despite the alleged warning. Plaintiffs therefore can show no pecuniary loss as a result of the alleged disparaging statement to Mather.

32. The Court does not necessarily adhere to *Murphy*'s holding that a claim of disparagement must be set forth with particularity in the complaint. *See Baxter Travenol Laboratories, Inc. v. LeMay,* 93 F.R.D. 379, 381 (S.D.Ohio 1981). However, the claimant must provide specifics at some point in the discovery process. Plaintiffs have failed to offer specific statements leading to pecuniary damages in this case.

or continue, a business relationship with another, or perform a contract with another ..." *Smith v. Klein*, 23 Ohio App.3d 146, 148 n. 1, 492 N.E.2d 852 (1985) (quoting *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 379 N.E.2d 235 (1977)) (emphasis added). However, "in Ohio, 'one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract.'" *Canderm Pharmacal v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting *Pearse v. McDonald's Systems of Ohio, Inc.*, 47 Ohio App.2d 20, 351 N.E.2d 788 (1975)). Factors determining whether a privilege exists include: (a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand. *Wright v. MetroHealth Medical Center*, 58 F.3d 1130, 1139 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 188 (1996); *Juhasz*, 55 Ohio App.2d at 57, 379 N.E.2d 235. If the actor is privileged, the plaintiff must prove that the actor proceeded with actual malice. *Smith v. Ameriflora 1992, Inc.*, 96 Ohio App.3d 179, 187, 644 N.E.2d 1038 (Franklin Co.1994).

▌ Plaintiffs' claim suffers the same infirmities as the prior claims. Defendants were privileged to discourage their own agents from leaving to affiliate with Re/Max. Any alleged "interference" by defendants was made in furtherance of their own legitimate expectancies. Plaintiffs cannot meet the burden of showing actual malice on the part of defendants.

Plaintiffs, who encouraged their buyer clients to include in their offers a requirement that commissions be split equally, appear to be asserting that defendants are acting improperly if they do not encourage the sellers to accept such offers. However,

defendants were not legally required to advise their seller clients to accept an offer at variance with the terms of the listing contract they had with those clients.

Accordingly, summary judgment is granted to both defendants with respect to Count X.

## VII. REALTY ONE'S COUNTERCLAIMS

Realty One asserts three counterclaims against Plaintiffs. Count I alleges that Plaintiffs conspired to restrain competition in violation of § 1 of the Sherman Act.[33] Counts II and III are state claims of tortious interference with business relationships and unfair competition, respectively.

### A. § 1 Conspiracy to Restrain Trade

Realty One's § 1 claims allege 1) Plaintiffs engaged in an illegal horizontal conspiracy to set the compensation that Re/Max brokers pay to other brokers for cooperative transactions (the "cooperative commission conspiracy" claim), and 2) plaintiffs engaged in an illegal horizontal conspiracy to conduct sham litigation and initiate sham government investigatory activity against Realty One (the "sham litigation" claim).

#### 1. The "Cooperative Commission Conspiracy" Claim

Realty One asserts that plaintiffs ("counterclaim defendants") have entered into a conspiracy to regulate how they deal with brokers outside of the conspiracy on broker-to-broker commission splits. It alleges that Re/Max Int'l "strongly encouraged" the counterclaim defendant franchisees to offer all selling brokers one-half of their listing brokers' fee. (Response Memorandum, Docket No. 326, at 5). It alleges further that counterclaim defendant franchisees agreed to this scheme and publicized it, comparing their policy favorably to Realty One's policy of imposing the ACS. Realty One labels such an agreement a conspiracy to fix prices and a *per se* violation of § 1.

---

**33.** Realty One's § 2 conspiracy to monopolize claim was dismissed by the Court in its May 10, 1995 order. Also dismissed were portions of Realty One's § 1 claim. *Re/Max Int'l*, 900 F.Supp. at 170.

A successful § 1 claim requires proof of three elements: 1) a contract, combination or conspiracy; 2) affecting interstate commerce; 3) which imposes an unreasonable restraint on trade. *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983). The third element is presumed if the plaintiff can establish a *per se* violation.[34] Realty One claims that the evidence permits the conclusion that the counterclaim defendants' alleged illegal agreement to set broker-to-broker commission splits amounted to an unlawful agreement to set prices, a type of restraint which falls under the *per se* standard. The Court accepts that characterization for summary judgment purposes. The Court believes a genuine issue of material fact exists as to whether at least some of the counterclaim defendants illegally agreed to set broker-to-broker commission splits. The evidence shows that such splits were discussed at meetings at which some of the counterclaim defendants were present. Some counterclaim defendants apparently utilized common forms incorporating a requirement that commissions be split equally.

However, the inquiry does not end with the finding of a possibility of a conspiracy. To maintain a private action against the counterclaim defendants, Realty One must show an antitrust-related injury to its business as a result of the alleged conspiracy. The Clayton Act, 15 U.S.C. § 15, restricts private enforcement of the antitrust statutes to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The counterclaim defendants argue that Realty One has failed to produce evidence showing it has suffered the requisite antitrust injury. Realty One claims that because a conspiracy to set prices is *per se* unlawful, there is no need to show specific damages to itself.

However, Realty One misperceives the relationship between the establishment of a *per se* unlawful agreement and the establishment of antitrust injury to a particular plaintiff. The fact that an agreement is *per se* unlawful may create a presumption that

the defendant has committed an antitrust violation, but it does not create a presumption that a particular plaintiff suffers an antitrust injury. In *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), the Supreme Court rejected the notion that no antitrust injury need be shown where a *per se* violation is involved:

> The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages.... The *per se* rule is a presumption of unreasonableness based on business certainty and litigation efficiency....
>
> The purpose of the antitrust injury requirement is different. It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief. Actions *per se* unlawful under the antitrust laws may nonetheless have *some* pro-competitive effects, and private parties might suffer losses therefrom.... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason. Pro-competitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages. Thus, proof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently.

*Atlantic Richfield Co.*, 495 U.S. at 341–344, 110 S.Ct. at 1893–94 (emphasis in original).

Realty One has made a case for a *per se* violation, but it fails to show an antitrust injury related to the anticompetitive

---

**34.** See page 1496 *supra* for a brief discussion on the distinction between the rule of reason and the *per se* rule.

effects of the alleged violation. Instead, it merely argues that "it is obvious" that an agreement to pay all selling brokers one-half of the listing broker's commission harms competition and consumers by providing the same compensation regardless of performance. (Answer Brief, Docket No. 326, at 6). Regardless of whether this blanket statement is true, Realty One has failed to show the required injury to its own "business or property," 15 U.S.C. § 15, as a result of the counterclaim defendants' alleged illegal agreement.[35] Accordingly, the counterclaim defendants' motion for summary judgment is granted with respect to the § 1 "cooperative commission conspiracy" claim.[36]

### 2. The "Sham Litigation" Claim

Realty One alleges that counterclaim defendants have initiated a series of lawsuits, up to and including this lawsuit, and requested government investigations for the sole purpose of interfering directly with Realty One's business. (Counterclaim, Docket No. 279, at ¶ 18).

■ Generally, those who petition the government for redress are immune from antitrust liability. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 56–58, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993) (citing *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 528–29, 5 L.Ed.2d 464 (1961)). However, where petitioning activity, ostensibly directed toward influencing governmental action, is in actuality a mere sham to cover an attempt to interfere directly with the business relation-

ships of a competitor, then the application of the Sherman Act may be justified. *Professional Real Estate,* 508 U.S. at 56–58, 113 S.Ct. at 1926. In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court applied the same principles "to the approach of citizens ... to administrative agencies ... and to courts." *Id.* at 510, 92 S.Ct. at 611.

■ The Supreme Court has cautioned that because the right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances, the antitrust laws will not prohibit the filing of a lawsuit, regardless of one's anticompetitive intent or purpose, unless the suit is a mere sham. *Professional Real Estate,* 508 U.S. at 56–58, 113 S.Ct. at 1926. Determining the presence of a sham requires the application of a two-part test:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail.... [Second,] the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of the governmental *process*—as opposed the *outcome* of that process—as an anticompetitive weapon.

---

**35.** Addressing the counterclaim defendants' argument that it had put forth no evidence of antitrust injury, Realty One appended to its answer brief an affidavit of its president, James C. Miller, attempting to articulate some specific harm. Mr. Miller's affidavit stated that the alleged conspiracy caused injury 1) by failing to compensate Realty One appropriately when Realty One provides greater services than other selling brokers and 2) by preventing Realty One from competing to obtain greater compensation for better services than its competitors. The Court finds that these last-minute assertions are little more than conclusory allegations. In any event, Realty One (and all other brokers and agents in the market) retain the competitive incentive to achieve the sale. Receiving a 50% commission split, which appears to be the aver-

age split on the MLS systems, is better than not making the sale and receiving no split at all.

**36.** This conclusion renders it unnecessary to address another troubling portion of Realty One's counterclaim: whether Re/Max Int'l and Re/Max NE Ohio, as franchisor and subfranchisor, could be considered part of a "horizontal" conspiracy. The Court's May 10, 1995, memorandum opinion indicated that Re/Max Int'l and Re/Max NE Ohio could be held liable under Realty One's cooperative commission conspiracy theory only if they have a horizontal relationship with the franchisees, i.e., if they are competitors on the same level of competition. *Re/Max Int'l,* 900 F.Supp. at 157.

*Professional Real Estate,* 508 U.S. at 60, 113 S.Ct. at 1928 (citations omitted).[37] In other words, an antitrust plaintiff must show that the litigation or requested investigation was both objectively baseless and subjectively intended to inflict economic injury.

■■■ The Court finds a genuine issue of material fact as to whether some or all of the counterclaim defendants have conspired to instigate a series of baseless lawsuits and governmental investigations in an effort to harm Realty One's competitive position in the marketplace for real estate brokerage services.[38] Among the evidence obtained by Realty One through discovery are 1) several documents from Re/Max Int'l from the late 1980s and early 1990s indicating it did not believe the imposition of the ACS was an antitrust violation;[39] 2) notes confirming Re/Max Int'l's plans to apply pressure on the Ohio Attorney General, the Federal Trade Commission and local elected officials; 3) the sequential filing by different plaintiffs of four virtually identical antitrust lawsuits against Realty One and Smythe Cramer in Ohio courts in 1990 and 1991, followed by the voluntary dismissal of those suits when defendants filed motions for summary judgment; 4) notes from a 1990 meeting attended by at least seven counterclaim defendants at which Re/Max Int'l general counsel John Linton spoke; referring to unspecified litigation, the notes included the comment: "No monetary award should be expected from lawsuit. At best, it will hopefully influence the adverse-imposing companies"; 5) other handwritten notes from the same meeting attributing the following comments to Linton: "Motivations for suit: influence, no

monetary award expected. Everyone will file suit one after another. Impose pressure on responsible real estate companies."

Counterclaim defendants argue that Realty One has failed to show that any alleged sham activities caused injury to competition, which is required in the antitrust context. However, Realty One has provided evidence of harm to itself as the largest or second-largest competitor in Northeast Ohio.[40] In that context, although Realty One will have to convince a jury that counterclaim defendants' alleged wrongful acts harmed competition, the Court finds that failing to articulate a specific injury to the market is not dispositive of the claim.

For these reasons, counterclaim defendants' motion for summary judgment is denied with respect to the antitrust sham litigation counterclaim.

*B. Intentional Interference With Business Relationships* [41]

Realty One asserts a state common law counterclaim of intentional tortious interference with business relationships. Realty One claims that the counterclaim defendants 1) interfere with business relationships with agents under contract to Realty One; and 2) interfere with business relationships with home sellers with active listing contracts with Realty One.

■■■ These claims are without merit. As to the first claim, there is no evidence that any Realty One employee breached a contract to go to work for any Re/Max franchisee. The evidence indicates that the vast

---

37. The Court's May 10 opinion devoted additional analysis to the underlying antitrust sham litigation principles. *Re/Max Int'l,* 900 F.Supp. at 159–61.

38. Counterclaim defendants point out correctly that four of the counterclaim defendant franchisees were not in existence at the time of the filing of four state lawsuits in 1990 and 1991. However, the counterclaim alleges a continuing pattern of instigating baseless suits that continues until the present suit, so the newer franchisees do not merit dismissal merely based upon their date of entering business.

39. Re/Max Int'l claims its position changed in 1992 when it became aware of the direct evi-

dence supplied by Leo Lee. See pages 1499–1500 *supra.* Whether this was Re/Max Int'l's motivation for changing its position, and the bearing, if any, this information would have on any role played by Re/Max Int'l in encouraging the 1990 and 1991 suits, are questions of fact not appropriate for summary judgment.

40. Realty One has documented in excess of $167,000 in legal fees to fight the four prior lawsuits and obviously is incurring a bundle of legal fees in the instant case.

41. For a general discussion of this business tort, see Section VI.C., *supra.*

majority of Realty One's agents have an at-will employment relationship with Realty One. Inducing an employee to leave an at-will employment situation is generally not a business tort.[42] *See LaFrance Electrical Construction & Supply Co. v. International Brotherhood of Electrical Workers, Local No. 8*, 108 Ohio St. 61, 93–94, 140 N.E. 899 (1923) ("It is difficult upon principle to see how persuading a man to do a thing, which he may himself do with perfect legality, can be illegal."). *See also Emery Enterprises, Inc. v. Standard Plumbing & Heating Co.*, 1988 WL 142865, 1988 Ohio App. LEXIS 5375 (Richland Co.1988) (persuasion of employees to leave their at-will employment, if unaccompanied by coercion, is not unlawful).

As to the second part of the claim, Realty One offers conclusory allegations but no evidence of a single Realty One listing contract which suffered interference from counterclaim defendants' conduct. Without any evidence of injury, it is unnecessary to determine whether counterclaim defendants' alleged encouragement of buyers to insist on a particular commission split in purchase offers would constitute tortious interference with Realty One's listing contracts.

Accordingly, counterclaim defendants' motion for summary judgment is granted with respect to the claim of interference with business relations (Count II).

### C. Unfair Competition

■ Realty One's final claim lies in unfair competition and is rooted in the same activities alleged in the prior state claims, i.e., counterclaim defendants' recruitment of Realty One's sales agents with "deceptive and misleading claims" and disruption of the contractual relationship between Realty One and sellers who contract for its brokerage services. (Counterclaim at ¶ 29). Realty One raises a new theory in its answer brief: coun-

terclaim defendants misappropriated trade secrets, including confidential proprietary materials such as its list of selling brokers on whom Realty One imposed the ACS.

The claim is unconvincing. The claims of deception and interference with contractual relations fail for the reasons put forth in the previous section. The eleventh-hour trade secrets claim is unsuccessful because Realty One does not provide evidence that its list of ACS brokers qualifies as a "trade secret" under Ohio law. *See Wiebold Studio, Inc. v. Old World Restorations, Inc.*, 19 Ohio App.3d 246, 248, 484 N.E.2d 280 (Hamilton Co. 1985) (trade secrets must be protected by substantial security measures). Moreover, Realty One fails to establish that the alleged misappropriation of the ACS list caused any injury.

Therefore, counterclaim defendants' motion for summary judgment is granted with respect to Realty One's claim of unfair competition (Count III).

### VIII. CONCLUSION

For the reasons set forth above, the motions for summary judgment are resolved as follows.

Realty One's motion for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 308), on the monopoly claims (Counts II, III and IV) (Docket No. 310), and on all other state law claims (Counts VIII, IX and X) (Docket No. 312) are granted in full.

Smythe Cramer's motions for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 306), on the monopoly claims (Counts II, V and VI) (Docket No. 307), and on all other state law claims (Counts VIII, IX and X) (Docket No. 304) are granted in full.

Plaintiffs' and intervening plaintiffs' motions for summary judgment on the counter-

---

**42.** Realty One apparently believes such activities are tortious in this case because counterclaim defendants' statements that Realty One agents would make more money as Re/Max franchisees were "deceptive and misleading." (Counterclaim at ¶ 23). However, Realty One has not offered proof that the statements were deceptive and misleading. And although Realty One disputes it, a system offering agents the opportunity to keep 95% to 100% of commissions rather than 50% would appear to increase compensation for at least some agents, even taking into consideration franchise-related fees and costs. The two sides apparently have a good-faith disagreement on which system best compensates brokers and agents. A statement by either that its system is best does not rise to the level of an actionable falsehood.

claims (Dockets No. 301 and 300, respectively) are denied with respect to Count I of the counterclaims insofar as Count I states a claim for conspiracy to conduct sham litigation and investigations in violation of § 1 of the Sherman Act. The motions are granted with respect to the "cooperative commission conspiracy" claim in Count I and with respect to Counts II and III.

The Court shall issue a judgment entry to this effect contemporaneously with the publication of this opinion.

## IX. RULE 54(b) CERTIFICATION

▰ The Court is of the view, for the reasons articulated in this section of the Court's opinion, that there is no just reason for delay of the entrance of a final judgment in favor of the defendants as to the summary judgments granted herein against the plaintiffs and the entrance of a final judgment in favor of the plaintiffs as to the summary judgment granted them as against the defendant Realty One.

By way of summary, the summary judgments granted herein follow:

Realty One's motions for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 308), on the monopoly claims (Counts II, III and IV) (Docket No. 310), and on all other state law claims (Counts VIII, IX and X) (Docket No. 312) are granted in full.

Smythe Cramer's motions for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 306), on the monopoly claims (Counts II, V and VI) (Docket No. 307), and on all other state law claims (Counts VIII, IX and X) (Docket No. 304) are granted in full.

Plaintiffs' and intervening plaintiffs' motions for summary judgment on Realty One's counterclaims (Dockets No. 301 and 300, respectively) are granted with respect to the "cooperative commission conspiracy" claim in Count I and with respect to Counts II and III.[43]

Rule 54(b) of the Federal Rules of Civil Procedure provides that:

**(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.P. 54(b).

Rule 54(b) was enacted as "a response to the need created by the liberal joinder provisions of the Federal Rules of Civil Procedure to revise 'what should be treated as a judicial unit for purposes of appellate jurisdiction.'" *Corrosioneering v. Thyssen Environmental Systems,* 807 F.2d 1279, 1282 (6th Cir.1986) (citation omitted). The Rule "'attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties.'" *Id.* (citations omitted). The determination of whether to allow for an appeal pursuant to Rule 54(b) is a matter left to the discretion of the district court. *Id.*

The Rule itself states that the district court must find that there is no just reason for delay of the appeal. Fed.R.Civ.P. 54(b). However, the Sixth Circuit has indicated that in order to avoid a finding of abuse of discre-

---

**43.** The motion of the plaintiffs for summary judgment against the defendant Realty One on its counterclaim in its count one for sham litigation

has been denied and remains for trial thus requiring the Court's consideration of a Rule 54(b) certification.

tion in the certification of an appeal pursuant to Rule 54(b), the "district court should do more than just recite the Rule 54(b) formula of 'no just reason for delay.'" *Id.; Solomon v. Aetna Life Ins. Co.,* 782 F.2d 58, 61 (6th Cir.1986). As the Supreme Court explained in *Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968):

> It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law.

*Id.* at 434, 88 S.Ct. at 1168.

The Sixth Circuit set forth a "nonexhaustive list" of factors to consider in *Corrosioneering, supra,* as follows:

> (1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like. Depending upon the factors of the particular case, all or some of the above factors may bear upon the propriety of the trial court's discretion in certifying a judgment as final under Rule 54(b).

*Corrosioneering,* 807 F.2d at 1283 (quoting *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360 (3d Cir.1975)).

The Court now proceeds to highlight the factors relevant to its determination to certify a final judgment in favor of the parties as above outlined.

The only claim that has survived is the sham litigation claim advanced as a counterclaim by Realty One against the plaintiffs. If the Court were to proceed to trial on that claim as this point in the proceedings, the defendant-counter claimant Realty One would move the Court to present evidence that the Court's entry of summary judgment in favor of Realty One on the anti-trust claims advanced by the plaintiffs in this case should be presented to the jury. The plaintiffs will argue that they have not had the opportunity to appeal this Court's entry of summary judgment. That potential dispute will be resolved by permitting the interlocutory appeal and staying the trial on the remaining sham litigation count until the anticipated appeal has been resolved.

This case has been the subject of extensive pleadings and discovery over a period of two years. The issues raised by this anti-trust case are unique and the resolution of this case, in all probability, will have an impact on the business of selling real estate on a nationwide basis. In that context, the Court finds that no additional action by this Court will moot the need for appellate review of this judgment.

The Court finds that there is no likelihood that the appellate court will be required to consider the same issues at a later time.

The Court finds that there is no claim or counterclaim that would result in a set-off should the judgment of the Court be made final.

The Court finds that awaiting the outcome of the trial on the sham litigation counterclaim advanced by the defendant Realty One will delay the commencement of appellate proceedings in this case. Moreover, the Court has been informed that some of the plaintiff realty companies have gone out of business and those companies are entitled to a prompt appellate decision on the merits of their anticipated appeals of the Court's decision.

For the reasons stated above and pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds and orders that there is no just reason for delay in entering final judgment with respect to the following judgments:

> Summary judgment for Realty One against the plaintiffs and intervening plaintiffs on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No.

308), on the monopoly claims (Counts II, III and IV) (Docket No. 310), and on all other state law claims (Counts VIII, IX and X) (Docket No. 312).

Summary judgment for the defendant Smythe Cramer against the plaintiffs and intervening plaintiffs on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 306), on the monopoly claims (Counts II, V and VI) (Docket No. 307), and on all other state law claims (Counts VIII, IX and X) (Docket No. 304).

Summary judgment for the plaintiffs and intervening plaintiffs against the defendant Realty One on its counterclaims (Dockets No. 301 and 300, respectively) with respect to the "cooperative commission conspiracy" claim in Count I and with respect to Counts II and III.

IT IS SO ORDERED.

### JUDGMENT ENTRY
(Resolving Docket Nos. 300, 301, 304, 306, 307, 308, 310 and 312)

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

Realty One's motions for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 308), on the monopoly claims (Counts II, III and IV) (Docket No. 310), and on all other state law claims (Counts VIII, IX and X) (Docket No. 312) are granted in full.

Smythe Cramer's motions for summary judgment on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 306), on the monopoly claims (Counts II, V and VI) (Docket No. 307), and on all other state law claims (Counts VIII, IX and X) (Docket No. 304) are granted in full.

Plaintiffs' and intervening plaintiffs' motions for summary judgment on the counterclaims (Dockets No. 301 and 300, respectively) are denied with respect to Count I of the counterclaims insofar as Count I states a claim for conspiracy to conduct sham litigation and investigations in violation of § 1 of the Sherman Act. The motions are granted with respect to the "cooperative commission conspiracy" claim in Count I and with respect to Counts II and III.

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS FURTHER ORDERED, ADJUDGED and DECREED that there is no just reason for delay under the provisions of Rule 54(b) of the Federal Rules of Civil Procedure with respect to the following judgments:

Summary judgment for Realty One against the plaintiffs and intervening plaintiffs on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 308), on the monopoly claims (Counts II, III and IV) (Docket No. 310), and on all other state law claims (Counts VIII, IX and X) (Docket No. 312).

Summary judgment for the defendant Smythe Cramer against the plaintiffs and intervening plaintiffs on federal and state antitrust conspiracy claims (Counts I and VII) (Docket No. 306), on the monopoly claims (Counts II, V and VI) (Docket No. 307), and on all other state law claims (Counts VIII, IX and X) (Docket No. 304).

Summary judgment for the plaintiffs and intervening plaintiffs against the defendant Realty One on its counterclaims (Dockets No. 301 and 300, respectively) with respect to the "cooperative commission conspiracy" claim in Count I and with respect to Counts II and III.